| | | |
|---|---|---|
| **NEVILLE KIRT; ALVIN KIRT; AND LAMONT KIRT, INDIVIDUALLY AND ON BEHALF OF ELAINE KIRT, DECEASED** | \* | **NO. 2024-CA-0273** |
| | \* | **COURT OF APPEAL** |
| | \* | **FOURTH CIRCUIT** |
| **VERSUS** | \* | **STATE OF LOUISIANA** |
| **REBECCA C. METZINGER, M.D.; THEODORE C. STRICKLAND, III, M.D.; ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND D/B/A TULANE; PAULINE TAQUINO, CRNA; GAYLE MARTIN, CRNA; PARISH ANESTHESIA ASSOCIATES, LTD, A PROFESSIONAL MEDICAL CORPORATION** | \* \* \* \* \* \* \* | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2013-07873, DIVISION "L"
Honorable Kern A. Reese, Judge
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*
(Court composed of Judge Sandra Cabrina Jenkins, Judge Paula A. Brown, Judge Karen K. Herman)

Hugo L. Chanez
Jeffrey A. Mitchell
THE COCHRAN FIRM
3850 N. Causeway Blvd., Suite 1500
Metairie, LA 70002

COUNSEL FOR PLAINTIFFS/APPELLANTS

C. William Bradley, Jr.
BRADLEY MURCHISON KELLY & SHEA, LLC
1100 Poydras St., Suite 2700
New Orleans, LA 70163

Benjamin J. Biller
SCHROEDER AND TRAHAN
One Galleria Blvd., Suite 700
Metairie, LA 70001

COUNSEL FOR DEFENDANTS/APPELLEES

**AFFIRMED**
**NOVEMBER 4, 2024**

This is a medical malpractice suit. Appellants/Plaintiffs, Neville Kirt, Alvin Kirt, and Lamont Kirt ("Plaintiffs"), the children of decedent, Elaine Kirt ("Ms. Kirt"), appeal the trial court judgment, dated December 20, 2023, which granted an exception of prescription filed by Appellees/Defendants, Pauline Taquino, CRNA and Parish Anesthesia Associates, LTD, and dismissed Plaintiffs' claims with prejudice. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Ms. Kirt was scheduled to undergo eye surgery on April 8, 2010, and due to complications that developed after the administration of anesthesia, she died on September 28, 2010.

As a result, on September 23, 2011, Plaintiffs filed a request for formation of a medical review panel with the Division of Administration naming three defendants: Rebecca C. Metzinger, M.D., Theodore C. Strickland, M.D., and Tulane University Hospital & Clinic ("TUHC"). The request for medical review panel provides that Dr. Metzinger was the attending physician and Dr. Strickland was the anesthesiologist.

1

In the request for formation of medical review panel, Plaintiffs alleged that Ms. Kirt was scheduled for corneal transplant surgery at TUHC and that sometime after Dr. Metzinger performed a "retrobulbar block"[1] in preparation of the procedure Ms. Kirt suffered a "PEA" (Pulseless Electrical Activity) and "had no pulse and was asystole" (a cardiac flat line).[2] Ms. Kirt was subsequently intubated by Dr. Strickland. Thereafter, Ms. Kirt experienced multiple PEAs, requiring several "code blue[s]" re-intubation, and a tracheostomy. Ms. Kirt was transferred to the ICU and died approximately five months later.[3]

Plaintiffs alleged that Ms. Kirt's PEA was directly related to the procedure and the medical care provided. Plaintiffs further allege the medical team failed to recognize that Ms. Kirt was not receiving enough blood and oxygen to her brain and that the defendants failed to "timely respond to Ms. Kirt's crisis" and intubate her. Plaintiffs alleged that the lack of perfusion[4] caused "irreversible damage" from which Ms. Kirt never recovered and died due to the alleged malpractice.

On October 17, 2011, Plaintiffs amended the original request for formation of a medical review panel to name Pauline A. Taquino, CRNA ("Taquino") and an

---

[1] The record indicates that retrobulbar block is used to numb the eye and prevent movement of the eye muscles.

[2] The request provided in part:

> Dr. Metzinger, in preparation for the procedure performed a retrobulbar block. The medical records reveal that the procedure began at 1220. Ms. Kirt's last vitals were recorded at 1235. At some point between 1235 and 1247 Ms. Kirt suffered a PEA (PEA #1). She had no pulse and was asystole. At 1247 Dr. Theodore C. Strickland was called in to intubate Ms. Kirt. Subsequently, Ms. Kirt suffered three (3) more PEAs each requiring a code blue and re-intubation. Due to the recurrent intubations a tracheostomy was performed. Additionally, following PEA #1, Ms. Kirt received SLED; causing acute renal failure. Resultantly, on September 28, 2010, due to defendant's acts and omissions, Ms. Kirt expired.

[3] The record shows that after the ICU she was transferred to Kindred Hospital, a facility that provides long-term acute care.

[4] Brain perfusion refers to the delivery of blood and oxygen to the brain.

"Unidentifiable CRNA" as additional defendants. The "unidentifiable CRNA" was later identified to be Gayle Martin, CRNA ("Martin"). Plaintiff alleged that "while Ms. Kirt was undergoing her corneal transplant" Taquino and Martin "failed to monitor Ms. Kirt's vitals" and that the "failure to monitor her vitals led to a delay in realizing that the patient was in distress, ultimately a delay in the response time to Ms. Kirt's crisis."

On November 17, 2011, Plaintiffs filed a second amended request to assert a malpractice claim against Parish Anesthesia of Tulane, LLC ("Parish Anesthesia"), who Plaintiffs alleged was the employer of Martin.

On August 6, 2012, Plaintiffs deposed Taquino, wherein Plaintiffs alleged they first discovered the extent of Taquino's negligence and that she was employed by Parish Anesthesia. In her deposition, Taquino testified that she assumed care of Ms. Kirt at approximately 12:28 p.m. from Martin. She testified that Ms. Kirt complained of hip pain and she administered a dose of Alfentanil to help with the pain. Taquino testified that she administered the medicine intravenously. Taquino stated she was unaware that several minutes prior Ms. Kirt had been administered Propofol. Taquino testified that shortly after administering Alfentanil, Ms. Kirt stopped responding. Plaintiffs allege that none of this information was contained in the illegible aesthesia record.

On May 22, 2013, the medical review panel unanimously found that there was no evidence to support the conclusion that the defendants had failed to meet the applicable standard of care as alleged in Plaintiffs' request.[5]

---

[5] The written reasons of the medical review panel, stated in part:

Based upon the information provided, both Dr. Metzinger and Dr. Strickland provided the necessary preoperative work-up, gave appropriate orders

On August 20, 2013, Plaintiffs filed a petition for damages against all the defendants named in the medical review panel proceedings. The petition contains the following relevant factual allegations as it relates to Parish Anesthesia and Taquino:

8.

On or about April 8, 2010, at 11:49, Ms. Kirt - awake at the time - was transported to the operating room. At 11:50 agents of Parish Anesthesia dilated Ms. Kirt with Allocaine 1%, Mydfrin, 2.5%, Mydriaeyl, 1% and 2 mg along with administering Valium and Mannitol, 12.5 grams, in preparation for the retrobulbar block. Upon information and belief a retrobulbar block 3 is painful, so just prior to Dr. Metzinger applying the block, CRNA Martin administered to Ms. Kirt 500 micrograms of Alfentanil, in incremental doses along with ten mg x 2 of Propofol.

9.

At 11:59 an "Accu chek" was performed, with a reading of 302. At 12:00 Ms. Kirt was administered the following: Oxygen at 2/10, Fentanyl 200 meg, Propofol l0 mg. Ms. Kirt's vitals are recorded as: 113/61, 70 spontaneous ventilations, EKG with a-fib, sinus rhythm, sats 100%. Lactated Ringers IV 500 cc is begun at this time.

10.

At 12:15 a Nasal Cannula is placed on Ms. Kirt. At 12:20 Ms. Kirt's vitals are recorded as: 138/60, 76.

11.

At 12:25 Dr. Metzinger performed the Retrobulbar Block with Lidocaine and Marcaine upon Ms. Kirt.

12.

---

prior to admission, and obtained informed consent. They were not involved in the administration of anesthesia or medications. Dr. Metzinger properly administered the retrobulbar block.

CRNA Martin properly administered the Alfentanil and Propofol, closely monitored Ms. Kirt, and then transferred care to CRNA Taquino.

CRNA Taquino administered Alfentanil 250 mg shortly after assuming care of Ms. Kirt.

Under the circumstances, this was not a breach of the standard of care. Once the event occurred, she responded quickly and appropriately, including calling for Dr. Strickland.

The medical records reflect that the hospital nurses and staff timely evaluated Ms. Kirt, followed and timely implemented the physicians' orders, and closely monitored Ms. Kirt, reporting their findings to the physicians.

4

Ms. Kirt's medical records - from the incident - evidence a 10 minute gap, where her vitals go unrecorded

13.

In a deposition during the medical review panel, CRNA Martin, "There is a 10-minute period in the anesthesia record in which there is no recordation of the patient's blood pressure or pulse. That 10 minute period was when the patient care was turned over to CRNA Taquino."

14.

At 12:30 Ms. Kirt's vitals were recorded as: 130/60, 68, sats 100%. At 12:35 Ms. Kirt is noted to be receiving oxygen per nasal cannula, sat 100%, 120/60,64, EKG a-fib/sinus rhythm.

15.

At 12:35 CRNA Taquino administered 250 meg of Alfentanil, via IV push, upon information and belief because the patient - Elaine Kirt - said her hip was hurting.

16.

In a deposition during the medical review panel, CRNA Taquino asserted that, "Alfentanil doesn't have to be given in a particular manner. The drug was not given in incremental doses by me because the patient was on monitors. I did not know whether or not the patient had received Propofol earlier. It would not be especially important to know that. From 12:40 until 1:00 - a 15 minute period -1 did not record any vital signs on the anesthesia graph."

17.

Upon information and belief at 12:42 - less than 10 minutes after administration of the Alfentanil in a non-incremental dosage - Elaine Kirt's conversation slowed and she quickly became non-responsive.

18.

Upon information and belief, CRNA Taquino "called the front for a stat." She notified the staff that the patient was not responding. Dr. Strickland was called, Epi was administered to Ms. Kirt, as well as Lidocaine and Calcium. CRNA Taquino alerted R.N. she needed her help and put a nasal airway in the patient's nose.

19.

At 12:51 Dr. Strickland placed an endotracheal tube in Ms. Kirt's airway. At 12:55-1:00 the patient started showing V-tach rhythm. At 13:40 the patient was admitted to the MICU of Tulane.

20.

Upon information and belief, the non-titrated second administering of Alfentanil caused Ms. Kirt to "code" at 12:42 on April 8, 2010. This first code set off a domino effect, compromising Ms. Kirt, so as to place her at risk for the multiple codes which she suffered over the next 173 days, as did delays in treatment and delays in placement within the proper units, culminating in Ms. Kirt's death on September 28, 2010.

Based on the foregoing, Plaintiffs alleged that Taquino failed to properly administer drugs to Ms. Kirt; failed to properly document Ms. Kirt's chart; failed to read Ms. Kirt's chart prior to administering drugs; failed to fully understand the drugs she was administering to Ms. Kirt; and failed to communicate with her fellow CRNA. Plaintiffs further alleged that Parish Anesthesia was responsible for Taquino's negligence as her employer.

On November 20, 2015, the trial court granted a motion for summary judgment in favor of Metzinger and dismissed Plaintiff's claims against her with prejudice. On December 4, 2015, the trial court also granted a motion for summary judgment in favor of Strickland and TUHC, dismissing them with prejudice.

Thereafter, on December 15 2015, Taquino, Martin, and Parish Anesthesia filed an exception of prescription based on two grounds: Plaintiffs' entire medical review panel request was invalid and without effect as to the suspension of prescription under La. R.S. 40:1231.8(A)(1)(e) because they failed to pay the final $100 filing fee; and in the alternative, that Plaintiffs' claims against them were prescribed under La. R.S. 9:5628(A) and La. C.C. arts. 2315.2(B) and 2349 as a result of the dismissal of all joint tortfeasors who had timely been named in Plaintiffs' request for the formation of a medical review panel.

In opposition, Plaintiffs argued the medical review panel proceeding involved several requests for review, including separate requests for Taquino and Parish Anesthesia. The filing fees for those requests were timely paid. While not paying the $100 filing fee to add Martin may have invalidated that particular claim, it should not retroactively invalidate claims against Taquino and Parish Anesthesia. Plaintiffs also argued that the alternative argument lacks merit as to Taquino and Parish Anesthesia because those claims were filed within one year of the discovery

6

of Taquino's negligence and within three years of her malpractice, making them timely under La. R.S. 9:5628(A).[6]

The exception of prescription came before the trial court on January 29, 2016, and was taken under advisement. On November 15, 2017, the trial court issued a judgment and written reasons granting the exception of prescription on the filing fee issue. Because the judgment lacked decretal language, the trial court issued an amended judgment on October 24, 2018, which contained the appropriate decretal language. Plaintiffs thereafter appealed.

On June 19, 2019, this Court affirmed the trial court decision in granting the exception, finding that Plaintiffs' failure to pay the complete filing fee rendered the entire panel request invalid. *Kirt v. Metzinger (Kirt I)*, 2019-0180, p. 7 (La. App. 4 Cir. 6/19/19), 274 So.3d 1271, 1275.

Plaintiffs applied for writs with the Louisiana Supreme Court. On April 3, 2020, the Louisiana Supreme Court granted writs and reversed in part. The Louisiana Supreme Court found that the failure to pay a filing fee for adding a defendant to a pending medical review panel proceeding only invalidated the claims against the added defendant, not all named defendants. *Kirt v. Metzinger (Kirt II)*, 2019-1162, pp. 9-10 (La. 4/3/20), 341 So.3d 1211, 1217. Thus, the Louisiana Supreme Court found that although Plaintiffs timely paid the filing fee as to Taquino and Parish Anesthesia, it was not timely paid as to Martin. As a result, the Louisiana Supreme Court affirmed the exception as to Martin and reversed as to Taquino and Parish Anesthesia. The Louisiana Supreme Court also remanded the case to trial court to consider and dispose of the remaining

---

[6] This summary of the parties arguments was set forth in *Kirt v. Metzinger (Kirt II)* 2019-1162, pp. 4-5 (La. 4/3/20), 341 So.3d 1211, 1213–14.

7

prescription argument, i.e., that the timely claims filed against the dismissed defendants did not suspend prescription against Taquino and Parish as the dismissed defendants were no longer joint/solidary obligors. *Kirt II*, 2019-1162, p. 14, 341 So.3d at 1219 ("The matter is remanded to the trial court for consideration and disposition of the alternative basis urged in support of the exception of prescription").

On August 17, 2020, a scheduling conference was held to discuss the need for a ruling on the alternative grounds of prescription. In October 2020, the parties jointly provided the trial court with all documents and materials relevant to the pending portion of the exception of prescription.

After receiving additional briefing from the parties in February 2021, the trial court took the matter under advisement. On June 21, 2022, the trial court issued an amended judgment and reasons, denying the exception of prescription as to Taquino and Parish Anesthesia, which provided in part:

> Considering the judgment of the Supreme Court, this court is vacating its judgment of November 15, 2017 and reasons for judgment in part on the exception of prescription relative to Pauline A. Taquino and Parish Anesthesia of Tulane, LLC. The medical malpractice claim against these named defendants are maintained and should go forward as ordered by the Louisiana Supreme Court order and reasons adopted herein. In all other respects, this court's judgment of November 15, 2017 and reasons for judgment are maintained. (See: Supreme Court Judgment-adopted herein).

Thereafter, Defendants filed writs with this Court. On August 18, 2022, this Court granted Defendants' writ application, finding "the trial court failed to comply with the Louisiana Supreme Court's instructions set forth in *Kirt [II]*." This Court also remanded the matter "to the trial court to conduct an evidentiary hearing on Relators-Defendants' alternative argument on the exception of the

prescription." *Kirt v. Metzinger (Kirt III),* 2022-0487, p. 3 (La. App. 4 Cir. 8/18/22), 346 So.3d 816, 817-18.

On December 16, 2022, the trial court heard the exception and decided to "hold this over" until trial and rule on it then. The trial court executed a judgment in this regard on December 19, 2022.

Defendants again sought writs with this Court. This Court granted the writ, vacated the trial court's judgment, and remanded with instructions. *Kirt v. Metzinger,* 2022-0855 (La. App. 4 Cir. 2/2/23) (*Kirt IV*). This Court stated:

> We find that the district court abused its discretion when it chose to bind this matter over for trial. Therefore, we grant Relators' writ application, vacate the district court's ruling, and remand this matter to the district court to comply with the directive issued by the Supreme Court in *Kirt II*, i.e., to reach a disposition concerning Relator's alternative argument on their exception of prescription.

*Kirt IV,* 2022-0855, p. 4, 357 So.3d at 495.

Again on remand, the trial court heard the exception of prescription on December 15, 2023 and granted the exception. The trial court stated:

> This case is going back up and down like an elevator. I read through this case very carefully and obviously read through the Fourth Circuit's decision very carefully. But I think it is prescribed on its face, so I am going to grant the exception.

On December 20, 2023, the trial court executed judgment to that effect and dismissed Plaintiffs' action against Taquino and Parish Anesthesia with prejudice.[7]

Plaintiffs timely appeal followed.

---

[7] The judgment provided, in part:

> IT IS ORDERED, ADJUDGED AND DECREED that the Peremptory Exception of Prescription is SUSTAINED in favor of Defendants CRNA Taquino and Parish Anesthesia and against Plaintiffs the Kirts.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs above numbered and captioned action is DISMISSED WITH PREJUDICE.

**APPLICABLE LAW**

Standard of Review and Burden of Proof

"When prescription is raised by peremptory exception, with evidence being introduced at the hearing on the exception, the trial court's findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review." *Barkerding v. Whittaker*, 2018-0415, pp. 13-14 (La. App. 4 Cir. 12/28/18), 263 So.3d 1170, 1180 (quoting *In re Med. Review Panel of Hurst*, 2016-0934, p. 4 (La. App. 4 Cir. 5/3/17), 220 So.3d 121, 125-26). "The relevant issue in a manifest error inquiry is not whether the finder of fact was right or wrong, but whether its decision was a reasonable one." *Hurst*, 2016-0934, p. 4, 220 So.3d at 126 (quoting *Marino v. Tenet Healthsystem Med. Ctr.*, 2009-0915, p. 4 (La. App. 4 Cir. 11/24/09), 26 So.3d 297, 300).

"When no evidence is introduced, the *de novo* standard applies." *Denoux v. Vessel Mgmt. Servs., Inc.*, 2007-2143, p. 6 (La. 5/21/08), 983 So.2d 84, 88 (observing that "[i]n the absence of evidence, the exception of prescription must be decided on the facts alleged in the petition, which are accepted as true"). As such, "the judgment is reviewed simply to determine whether the trial court's decision was legally correct." *Wells Fargo Fin. Louisiana, Inc. v. Galloway*, 2017-0413, p. 8 (La. App. 4 Cir. 11/15/17), 231 So.3d 793, 800 (citing *Arton v. Tedesco*, 2014-1281, p. 3 (La. App. 3 Cir. 4/29/15), 176 So.3d 1125, 1128).[8]

This Court in *Hurst*, 2016-0934, p. 5, 220 So.3d at 126, outlined the burden on an exception of prescription in a medical malpractice action as follows:

---

[8] There were exhibits attached to the exception, opposition, and briefs relating to the exception of prescription; however, it does not appear from the December 15, 2023 hearing that the exhibits were officially offered into evidence. Nevertheless, evidence was specifically introduced at the original hearing on the exception on January 29, 2016 and both parties refer to evidence in their briefs.

"Ordinarily, the movant bears the burden of proof on the trial of the peremptory exception of prescription." *Ferguson v. Sugar,* [20]05–0921, [20]05-0922 (La. App. 4 Cir. 6/25/08), 988 So.2d 816, 824. The burden remains with the movant where the plaintiff's petition makes "a prima facie showing" that the suit was filed within the delays set forth in La. R.S. 9:5628. *Id.* "A petition should not be found prescribed on its face if it is brought within one year of the date of discovery and facts alleged with particularity in the petition show that the patient was unaware of the malpractice prior to the alleged date of discovery, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the [plaintiff]." *Id.* (citing *Campo v. Correa*, [20]01-2707, p. 9 (La. 6/21/02), 828 So.2d 502, 509) []. If, however, the petition on its face reveals that prescription has run, the burden shifts to the plaintiff to show that his action has not prescribed. *Id.*[9]

Prescription and Suspension for Louisiana Medical Malpractice Actions

The special prescriptive period governing medical malpractice actions in

Louisiana is set forth in La. R.S. 9:5628(A), which provides:

No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital or nursing home duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1231.1(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.

The statute thus provides "two prescriptive limits within which to bring a

medical malpractice action, namely one year from the date of the alleged act or one

year from the date of discovery, with a three year limitation from the date of the

---

[9] This Court has applied "the burden-shifting jurisprudence … to a request for a medical review panel." *Primus v. Touro Infirmary*, 2005-662, p. 4 (La. App. 4 Cir. 1/25/06), 925 So.2d. In other words, this Court has looked solely to the allegations contained in the request for medical review panel to determine if the plaintiffs' claims "had prescribed on the face of their request" and found that "the burden shift to [the plaintiffs] to show that their claims had not prescribed." *Id.* at p. 5, 925 So.2d at 612; *see also Granier v. Lexington Ins*. Co., 2019-0657, pp. 4-5 (La. App. 4 Cir. 12/27/19), 288 So.3d 268, 272.

11

alleged act, omission or neglect." *Ferguson v. Sugar,* 2005-0921, p. 9 (La. App. 4 Cir. 6/25/08), 988 So.2d 816, 824 (citing *Campo v. Correa,* 2001–2707, p. 9 (La. 6/21/02), 828 So.2d 502, 509); *see also Carter v. Haygood,* 2004-0646, p. 10 (La. 1/19/05), 892 So.2d 1261, 1268.

This case involves both claims for wrongful death and survival. "Although survival action claims are governed by La. R.S. 9:5628(A), wrongful death claims are governed by the one-year period applicable to delictual actions set forth in La. C.C. art. 3492."[10] *Med. Rev. Complaint by Downing,* 2018-1027, pp. 6-7 (La. App. 4 Cir. 5/8/19), 272 So.3d 55, 59 (citing *Taylor v. Giddens*, 618 So.2d 834, 842 (La. 1993)). [11] Delictual actions have a prescriptive period of one year which begins to

---

[10] La. C.C. art. 3492 was repealed by Acts 2024, No. 423, § 2.  La. C.C. art. 3493.1, effective July 1, 2024, now provides a two year prescriptive period for delictual actions.  It states:

> Delictual actions are subject to a liberative prescription of two years. This prescription commences to run from the day that injury or damage is sustained. It does not run against minors or interdicts in actions involving permanent disability and brought pursuant to the Louisiana Products Liability Act or state law governing product liability actions in effect at the time of the injury or damage.

At the time Plaintiffs' medical malpractice claim arose, La. C.C. art. 3492 was still in effect.

[11] The Louisiana Supreme Court in *Taylor* explained:

> Although both actions arise from a common tort, survival and wrongful death actions are separate and distinct. *Guidry v. Theriot,* 377 So.2d 319 (La.1979). Each right arises at a different time and addresses itself to the recovery of damages for totally different injuries and losses. *Id.* The survival action comes into existence simultaneously with the existence of the tort and is transmitted to beneficiaries upon the victim's death and permits recovery only for the damages suffered by the victim from the time of injury to the moment of death. *Id.* It is in the nature of a succession right. Comment, *Wrongful Death: Prescription? Peremption? Confusion!* 39 La.L.Rev. 1239, 1249 (1979). On the other hand, the wrongful death action does not arise until the victim dies and it compensates the beneficiaries for their own injuries which they suffer from the moment of the victim's death and thereafter. *Guidry v. Theriot, supra.* Wrongful death damages compensate beneficiaries for their own injuries. 39 La.L.Rev. 1239, *supra* at 1249.

*Taylor,* 618 So.2d at 840.

run from the date the injury or damage is sustained. La. C.C. art. 3492.[12] The "plaintiffs' injury in a wrongful death action occurs when the victim dies" and thus a wrongful death action arises on the "date of the victim's death." *Walls v. Am. Optical Corp.*, 1998-0455, p. 9 (La. 9/8/99), 740 So.2d 1262, 1270 (citing *Taylor,* 618 So.2d at 840). "Wrongful death claims, nonetheless, 'continue to be governed and procedurally controlled by the provisions of the Act [].'" *Med. Rev. Complaint by Downing,* 2018-1027, p. 7, 272 So.3d at 59 (quoting *Taylor*, 618 So.2d at 841).

Another pertinent provision is La. R.S. 40:1231.8(A)(1)(a), which provides when a medical review panel is timely confected and for the suspension of prescription. Prior to filing a lawsuit against a qualified health provider, the plaintiff must first file a complaint with the medial review panel. *Med. Rev. Complaint by Downing*, 2018-1027, p. 7, 272 So.3d at 59; La. R.S. 40:1231.8(A)(1)(a). The filing of the request for a medical review panel suspends prescription against all parties named in the complaint and all joint and solidary obligors until ninety days following notification of the opinion to plaintiff. *See Santiago v. Tulane Univ. Hosp. & Clinic*, 2012-1095, p. 8 (La. App. 4 Cir. 4/24/13), 115 So.3d 675, 681.

La. R.S. 40:1231.8(A)(2)(a) states:

> The filing of the request for a review of a claim shall suspend the time within which suit must be instituted, in accordance with this Part, until ninety days following notification, by certified mail, as provided in Subsection J of this Section, to the claimant or his attorney of the issuance of the opinion by the medical review panel, in the case of those health care providers covered by this Part, or in the case of a health care provider against whom a claim has been filed under the provisions of this Part, but who has not qualified under this Part, until ninety days following notification by certified mail to the claimant or his attorney by the board that the health care provider is not covered by this Part. **The filing of a request for review of a**

---

[12] *See* n. 10.

**claim shall suspend the running of prescription against all joint and solidary obligors, and all joint tortfeasors, including but not limited to health care providers, both qualified and not qualified, to the same extent that prescription is suspended against the party or parties that are the subject of the request for review**. Filing a request for review of a malpractice claim as required by this Section with any agency or entity other than the division of administration shall not suspend or interrupt the running of prescription. All requests for review of a malpractice claim identifying additional health care providers shall also be filed with the division of administration.

(emphasis added).

Additionally, "[i]t is well-settled that where no liability is found on the part of a timely sued alleged tortfeasor, prescription will not be interrupted or suspended as to another tortfeasor, who is not timely sued, since no joint or solidary obligation exists." *Ferrara v. Starmed Staffing, LP*, 2010-0589, pp. 5-6 (La. App. 4 Cir. 10/6/10), 50 So.3d 861, 866, *writ denied sub nom. Ferrara v. Starmed Staffing, LP.,* 2010-2484 (La. 2/4/11), 57 So.3d 311 (citing *Renfroe v. State of Louisiana, Dep't of Transp. and Dev.*, 2001–1646, p. 4 (La. 2/26/02), 809 So.2d 947, 950).

<u>*Contra Non Valentem* / Discovery Rule</u>

To "soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: *contra non valentem non currit praescriptio,* which means that prescription does not run against a person who could not bring his suit." *Med. Rev. Panel Proc. for Timpton v. Touro Infirmary,* 2020-0522, p. 7 (La. App. 4 Cir. 2/10/21), 313 So.3d 1022, 1028–29 (quoting *Carter*, 2004-0646, p. 11, 892 So.2d at 1268). "*Contra non valentem* is a Louisiana jurisprudential doctrine under which prescription may be suspended." *Id*.

The doctrine of *contra non valentem* delineates four situations which would suspend the time limitations outlined in La. R.S. 9:5628, the fourth of which, the

"discovery rule," is the one implicated in this matter. *Fisher v. Blood Ctr.,* 2020-0551, p. 8 (La. App. 4 Cir. 2/10/21), 313 So.3d 1275, 1281 (citing *Fontenot v. ABC Ins. Co.*, 1995-1707, p. 4 (La. 6/7/96), 674 So.2d 960, 963). "The discovery exception embodied in [La. R.S. 9:5628] is a codification of the fourth category of *contra non valentem* for cases in which the cause of action is not immediately knowable. Under this discovery rule, such actions prescribe one year from the date of discovery of the alleged act, omission or neglect." *Id.* (quoting *In re Med. Review Panel for Claim of Moses,* 2000-2643, p. 8 (La. 5/25/01), 788 So.2d 1173, 1178-79). "The discovery rule is further limited by the language of La. R.S. 9:5628 and is inapplicable after three years from the injury causing act, omission or neglect." *Id.* (citing *Borel v. Young*, 2007-0419, p. 29, (La. 11/27/07), 989 So.2d 42, 69).

"Prescription begins 'when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort.'" *In re Med. Rev. Panel of Heath*, 2021-01367, p. 5 (La. 6/29/22), 345 So.3d 992, 996 (quoting *Campo*, 2001-2707, pp. 11-12, 828 So.2d at 510). "Constructive knowledge is 'whatever notice is enough to excite attention and put the injured person on guard and call for inquiry.'" *Id.* (quoting *Campo*, 2001-2707, pp. 11-12, 828 So.2d at 510-11). "A plaintiff is then imputed with whatever knowledge a reasonable inquiry or investigation would reveal." *Id.*

**DISCUSSION**

On appeal, Plaintiffs argue that the trial court erred when it refused to apply the discovery rule to their claims against Taquino and Parish Anesthesia. Plaintiffs argue that the cause of action against Taquino and Parish Anesthesia could not have been discovered until Taquino's deposition in August 6, 2012, when they first

15

learned information Ms. Kirt was overmedicated with Alfentanil by Taquino and that Taquino was employed by Parish Anesthesia because this information was not discernable from the medical records. Plaintiffs thus contend that the October 17, 2011 claim against Taquino and the November 17, 2011 claim against Parish Anesthesia were within three years of the malpractice and within one year of when they discovered their cause of action.

However, Taquino and Parish Anesthesia argue that the trial court properly granted the exception of prescription. They contend that Plaintiffs' claim against them are prescribed on its face because the medical review panel requests as to Taquino and Parish Anesthesia were filed over one year from the April 8, 2010 malpractice and over one year from the September 28, 2020 death of Ms. Kirt.

Taquino and Parish Anesthesia further argue Plaintiffs' claims against them are prescribed as a result of the dismissal of all the joint obligors who had been timely named. They noted that while the claims against Metzinger, Strickland, and TUHC were filed on September 23, 2011, those defendants were found free from fault and dismissed by summary judgment. Taquino and Parish Anesthesia thus argue that once the timely named defendants were dismissed the suspensive effect of prescription ceased as to Taquino and Parish Anesthesia because there was no joint or solidary obligation.

Taquino and Parish Anesthesia also claim the doctrine of *contra non valentum* does not save Plaintiffs' claims. They note that Plaintiffs' panel request stated Ms. Kirt's complications arose during her anesthetic course, resulting in her eventual death, thus Plaintiffs had knowledge that her death might have been related to improper medical treatment. They further argue Plaintiffs have no basis to assert a delay in the discovery of malpractice.

Taquino and Parish Anesthesia's arguments are persuasive.

As stated above, while the exceptor generally bears the burden of proof on trial of the peremptory exception of prescription, where a petition reveals on its face that prescription has run, the burden shifts to the plaintiff to show that his action has not prescribed. *Primus v. Touro Infirmary*, 2005-662, p. 2 (La. App. 4 Cir. 1/25/06), 925 So.2d 609, 610 (citing *SS v. State, Dept. of Social Services,* 2002-0831, pp. 6-7 (La.12/4/02), 831 So.2d 926, 931; *Mixon v. Cembell Industries, Inc.,* 2002-0804, p. 2 (La. App. 4 Cir. 9/18/02), 828 So.2d 660, 662).

This Court also found that where a medical review panel complaint "sets forth no 'facts alleged with particularity ... to show that [a plaintiff] was unaware of the malpractice prior to the alleged date of discovery' ... [and the] complaint was filed more than one year after the date of the alleged malpractice, [a] complaint, on its face, is prescribed [and] the burden shift[s] to [the plaintiff] to show that [the] action is not prescribed." *Granier v. Lexington Ins*. Co., 2019-0657, p. 5 (La. App. 4 Cir. 12/27/19), 288 So.3d 268, 272 (alterations in original) (quoting *In re Med. Rev. Panel of Hurst,* 2016-0934, p. 6, 220 So.3d at 126).

Plaintiffs' survival action began to run from the date of malpractice (April 8, 2010) or date of discovery of negligence (according to Plaintiffs' when Taquino was deposed on August 6, 2012), with the three year limitation of the date of the malpractice. Plaintiffs' wrongful death action began to run at Ms. Kirt's death (September, 28, 2010). Thus, Plaintiffs' wrongful death claim prescribed on September 28, 2011. Plaintiffs' survival action prescribed on April 8, 2011 or August 6, 2013, a year from the date they alleged they discovered malpractice of which they were previously unaware.

17

The medical review panel request as to Taquino was filed on October 17, 2011 and the request as to Parish Anesthesia was filed on November 17, 2011. The wrongful death action of Plaintiffs is prescribed on its face as it was not filed within a year of Ms. Kirt's death and Plaintiffs do not dispute that they were aware of the date Ms. Kirt had died.[13] *See Carter v. Ochsner Clinic Found.,* 2007-889, p. 6 (La. App. 5 Cir. 3/11/08), 978 So.2d 562, 565 (stating that "[i]n a malpractice case in which the victim of the alleged malpractice dies, the damage resulting from the alleged malpractice is readily apparent").

Likewise, Plaintiffs' survival action is prescribed on its face. The requests for medical review against Taquino and Parish Anesthesia were filed over a year after the date of surgery and the alleged malpractice. Additionally, the requests for medical review panel did not allege any particularized facts that indicated that Plaintiffs were not aware of Taquino and Parish Anesthesia's negligence prior to the discovery thereof or an explanation as to why they were untimely added.[14] *See Granier*, 2019-0657, p. 5, 288 So.3d at 272 (finding that when the request for review of a physician's treatment occurred years after treatment and the request "set[] forth no 'particularized' facts which demonstrate[d] the date of the plaintiffs' discovery of the alleged malpractice or any explanation as to why [the doctor] was being added as a defendant at such a late date," the plaintiffs' claim on its face was untimely and the "burden shifted to plaintiffs to show that it had not prescribed");

---

[13] In fact, the petition for damages alleges "[f]rom April 8, 2010, until September 28, 2010," Plaintiffs "collectively maintained vigil at their mother's bedside, until her death."

[14] Although the exception addresses the untimeliness of the medical review panel complaint, and thus the facts alleged in the post-panel petition are arguably not relevant, the petition for damages likewise does not specifically allege that delayed date of discovery nor does it detail how or why Plaintiffs were unaware Taquino and Parish Anesthesia's malpractice prior to the deposition. Notably, the petition was filed after Taquino was deposed.

*see also Hurst,* 2016-0934, p. 6, 220 So.3d at 126 (finding that where the medical review panel complaint failed to set forth facts alleged with particularity to show that the patient was unaware of the malpractice prior to the alleged date of discovery, the burden shifted to the patient to show why his claims are not prescribed).[15] Accordingly, the burden shifts to Plaintiffs to establish their claims had not prescribed. As discussed herein, Plaintiffs cannot meet this burden as they cannot rely on the suspension of prescription based on timely named solidary obligors nor the application of the doctrine of *contra non valentem.*

As noted earlier, Louisiana jurisprudence has found that "where no liability is found on the part of a timely sued alleged tortfeasor, prescription will not be interrupted or suspended as to another tortfeasor, who is not timely sued, since no joint or solidary obligation exists." *Ferrara*, 2010-0589, pp. 5-6, 50 So.3d at 866.

In *Granier*, the plaintiffs, the patient and her husband, filed a claim with the Division of Administration seeking a medical review panel to investigate her treatment with Dr. Vernon Carrie on September 28, 2010 related to a September 29, 2009 surgical procedure, wherein the patient's bowel was injured.

Approximately, fifteen months later, on December 20, 2011, the plaintiffs filed an amended medical malpractice complaint naming Dr. Steven Jones, claiming he examined the patient following the surgery on October 2, 2009, and diagnosed a post-operative ileus and recommended GI rest and failed to diagnose her with a perforated bowel. After the medical review panel found no breach in the standard of care, the plaintiff filed suit against Dr. Carriere and Dr. Jones, and their

---

[15] *Compare Campo,* 2001-2707, pp. 9-10, 828 So.2d at 509 (holding that a petition cannot be considered prescribed on its face if the plaintiffs' pleadings make a prima facie showing that it was filed "within one year of the date of discovery and facts *alleged with particularity in the petition show that the patient was unaware of malpractice prior to the alleged date of discovery*, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the [plaintiffs]").

insurers. The trial court granted summary judgment in favor or Dr. Carriere and his insurer and dismissed them from the action with prejudice. Thereafter, Dr. Jones and his insurer filed an exception of prescription, which the trial court granted. On appeal, the Fourth Circuit first found that that the plaintiffs' claims against the defendants were prescribed and that the burden shifted to the plaintiffs to show "the suspension, interruption or renunciation of prescription." *Granier,* 2019-0657, p. 5, 288 So.3d at 272 (quoting *Jones v. State*, 2004-0717, p. 3 (La. App. 4 Cir. 9/29/04), 891 So.2d 698, 701). The Court then found that the plaintiffs could not rely on La. R.S. 40:1231.8 (A)(2)(a) for the suspension of prescription against all joint and solidary obligors because no joint or solidary obligation exists as a result of the dismissal of the timely named defendants.[16]

---

[16] The *Granier* Court stated:

> Plaintiffs cannot rely on the suspension of prescription against solidary obligors provisions [o]f La. R.S. 40:1231.8 in this case. Although the medical review panel proceeding was timely commenced against Dr. Carriere, those claims were dismissed from this case on a motion for summary judgment, the basis of which was plaintiffs' inability to meet their burden of proving "that there was a deviation from the standard of care and a causal connection between the allegations of Dr. Carriere's malpractice and the damages sustained by Ms. Granier." Our jurisprudence reflects that "where no liability is found on the part of a timely sued alleged tortfeasor, prescription will not be interrupted or suspended as to another tortfeasor, who is not timely sued, since no joint or solidary obligation exists." *Ferrara v. Starmed Staffing, LP*, [20]10-0589, p. 5 (La. App. 4 Cir. 10/6/10), 50 So.3d 861, 866. *See also*, *Sims v. Am. Ins. Co.*, [20]12-0204, pp. 6-7 (La. 10/16/12), 101 So.3d 1, 6 ("while prescription is interrupted by suit against one solidary obligor or joint tortfeasor as to the other solidary obligors and joint tortfeasors not timely sued, ... where the timely sued defendant is ultimately found not liable to plaintiffs, the suit against the untimely sued defendants will then be dismissed, because no joint or solidary obligation would exist."). Accordingly, because Dr. Carriere was dismissed with prejudice from this action, prescription was not suspended as to Dr. Jones as there is no joint or solidary obligation.

*Granier*, 2019-0657, p. 6, 288 So.3d at 273. The Court also found that the patient had constructive knowledge that that her injuries resulted from Dr. Jones's failure to diagnose bowel perforation a year before adding Dr. Jones in the medical panel request and rejected the plaintiffs

Likewise, in the present case, the timely added defendants were found not liable on a motion for summary judgment and thus prescription as to Taquino and Parish Anesthesia is not interrupted or suspended because joint or solidary obligation no longer exists. As such, like in *Granier*, La. R.S. 40:1231.8 (A)(2)(a) does not suspend prescription against Taquino and Parish Anesthesia in this case.[17]

Plaintiffs further argue that the request for medical review panel was instituted within a year from when they discovered the extent of Taquino's "level of involvement" and overmedication of Ms. Kirt in her August 2012 deposition and thus under the discovery rule the actions against Taquino and Parish Anesthesia are timely.[18] Plaintiffs contend that the anesthesia records are illegible and Parish Anesthesia does not appear anywhere in the medical records.[19] Plaintiffs thus claim that they could not reasonably identify Parish Anesthesia as Taquino's employer nor the specifics of Taquino's negligence until Taquino's deposition.[20]

claim that they were unaware of the malpractice until the deposition of Dr. Carriere. *Granier*, 2019-0657, p. 7, 288 So.3d at 273.

[17] *See also Robin v. Hebert,* 2012–1417, p. 11 (La. App. 3d Cir. 5/1/13), 157 So.3d 63, 70 (finding that upon the dismissal of the physician, the late-added defendants, who were not qualified providers, were not joint or solidary tortfeasors subject to the suspension of prescription under La. R.S. 40:1231.8 (A)(2)(a); stating "[w]ithout an action against Dr. Mounir, there cannot be suspension of prescription against Hebert/Boyer's since there can be no joint/solidary obligors"); *Williams v. Northgate Hospital,* 98–1477 (La. App. 3 Cir. 5/5/99), 734 So.2d 1251 (finding that an unqualified hospital could not be considered a joint or solidary obligor with a timely sued doctor where the doctor was found not liable).

[18] Plaintiffs also note in their brief that after filing its initial complaint requesting medical review panel in September 2011, they were "anecdotally" advised by TUHC that TUHC does not employ the CRNAs. However, Plaintiffs do not point to any document in the record evidencing the date in which they were informally advised that CRNA were not employed by TUHC. In fact, to support this contention they cite to Dr. Metzinger's deposition that occurred in November 2012.

[19] The record on appeal does not contain the entirety of the medical record, only portions, specifically, the anesthesia records and at least one page of TUHC's records.

[20] Plaintiffs do not specify the date that they had received the medical records. However, Taquino and Parish Anesthesia suggested in their original exception of prescription that TUHC's

21

As discussed above, the discovery rule set forth in La. R.S. 9:5628 is "an exception to the general rule that medical malpractice actions must be commenced within one year of the date of the alleged malpractice." *Granier*, 2019-0657, 288 So.3d at 273–74 (citing *Moses*, 2000-2643, p. 8, 788 So.2d at 1178). Under the discovery rule, the one-year prescriptive period begins "when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort." *Campo*, 2001-2707, pp. 11-12, 828 So.2d at 510.

This Court in *Timpton*, 2020-0522, pp. 8-9, 313 So.3d at 1029–30, outlined that law on discovery and reasonableness of the date of discovery as follows:

> Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. *Percy v. State, E.A. Conway Memorial Hosp.*, 478 So.2d 570 (La. App. 2 Cir. 1985). A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription. *Ledet v. Miller*, 459 So.2d 202 (La. App. 3 Cir. 1984), *writ denied*, 463 So.2d 603 (La. 1985); *Bayonne v. Hartford Insurance Co.*, 353 So.2d 1051 (La. App. 2 Cir. 1977); *Opelousas General Hospital v. Guillory*, 429 So.2d 550 (La. App. 3 Cir. 1983). Nevertheless, a plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. *Gunter v. Plauche*, 439 So.2d 437, 439 (La. 1983). Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be treatment related. *Griffin v. Kinberger*, 507 So.2d 821 (La. 1987). The ultimate issue is the reasonableness of the patient''s action or inaction, in light of his

---

medical records were immediately available to Plaintiffs after Ms. Kirt's death on September 28, 2010.

education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct. *See Griffin*, 507 So.2d at 821.

(quoting *Campo*, 2001-2707, pp. 11-12, 828 So.2d at 510-11).

Plaintiffs are correct in that the anesthesia records are handwritten and difficult to decipher. Additionally, the medical documents contained in the record for appeal do not include any reference to Parish Anesthesia; they only refer to TUHC. However, Taquino's signature is visible on the anesthesia records and a typewritten note in the TUHC medical records lists Taquino as one of the CRNAs present during Ms. Kirt's procedure.[21] Furthermore, Plaintiffs named Taquino and Parish Anesthesia in their amended requests for formation of medical review panel months before Taquino's deposition.

It is undisputed that Plaintiffs filed medical review complaints against Taquino and Parish Anesthesia, on October 17, 2011 and November 17, 2011, respectively. Moreover, Plaintiffs were able to make allegations of negligence against Taquino related to her failure to monitor vital signs, to intubate, and timely respond to Ms. Kirts' distress in their medical review complaints. Plaintiffs also were capable of naming Parish Anesthesia in the request for review as the employer of the "unidentified CRNA" (Martin) who failed to monitor, and timely intubate and respond to Ms. Kirt's signs of distress.[22] The fact that Parish Anesthesia was named in connection with another CRNA, and not Taquino, does not alter the fact that Plaintiffs had knowledge of Parish Anesthesia's involvement

---

[21] The page containing the staff on duty for April 8, 2010 surgery is attached to the original reply memorandum in support of the exception of prescription filed in January 2016.

[22] As noted above, Plaintiffs conceded in their brief that they became aware that CRNA was not employed by TUHC between the filing of the initial request (September 2011) for medical review panel and the amended requests (October/November 2011). *See* n. 14. Thus, it is arguable that Plaintiffs had a duty to make further inquiries as to the true employer of the CRNAs after September 2011.

in the alleged negligent medical treatment of Ms. Kirt. Thus, Plaintiffs were purportedly aware of some possible improper conduct on Taquino and Parish Anesthesia's part nine to ten months prior to Taquino's deposition.[23] As such, Plaintiffs contention that they first discovered Taquino and Parish Anesthesia's malpractice in Taquino's deposition is ill-founded.

Nevertheless, to support their position, Plaintiffs rely on *Ferrara*, 2010-0589, 50 So.3d 861, which found that *contra non valentem* applied where the nurse's name appeared only in handwritten form in the medical records and the nurse's employer was not contained in the medical records. The *Ferrara* Court found that the plaintiff "could not have reasonably identified the identity" of the nurse or her employer until the defendant hospital "responded to the discovery request and furnished their identity." *Id*. at p. 9, 50 So.3d at 867. However, as noted herein, contrary to *Ferrara*, Taquino's name was typewritten on the THUC records and her signature was legible on the anesthesia record. Additionally, both Taquino and Parish Anesthesia were named in the amended medical review complaints and thus unlike in *Ferrara*, Taquino's identity and her employer were knowable several months prior to Taquino's deposition. As such, *Ferrara* is distinguishable.

---

[23] In their brief, Plaintiffs argue that their good faith request for medical review panel should not alter the discovery rule's trigger date (Taquino's deposition) because they did not have sufficient information at that time to meet the legal elements to trigger prescription. Plaintiffs cite *Guitreau v. Kucharchuk*, 1999-2570, p. 6 (La. 5/16/00), 763 So.2d 575, 580, which stated that "[m]ere notice of a wrongful act will not suffice to commence the running of the prescriptive period" and that "in order for the prescriptive period to commence, the plaintiff must be able to state a cause of action—both a wrongful act and resultant damage." As stated above, Plaintiff stated a claim for negligence (failed to monitor vitals and failed to timely intubate) and damages (suffering and death of Ms. Kirt) in their request for review several months prior to the date of Taquino's deposition.

Furthermore, the record shows that Ms. Kirt became unresponsive approximately ten minutes after Taquino administered anesthesia in response to Ms. Kirt's complaint of hip pain. Thereafter, Ms. Kirt coded several times, was transferred to ICU, and her condition declined until her death in September 2010, five months after the scheduled surgery. The corneal transplant never occurred. [24] The fact that Ms. Kirt never underwent the scheduled procedure subsequent to the administration of anesthesia, suffered multiple PEAs, and subsequently died was sufficient to excite or alert Plaintiffs' attention to possible malpractice. While Plaintiffs are not medically trained and according to their brief have "little to no education," Ms. Kirt's deterioration and death following anesthesia put Plaintiffs on notice and call for inquiry of potential medical negligence before the one year prescriptive period had elapsed. Moreover, this Court has found that a plaintiff "need not be informed by an attorney or physician of the possibility of malpractice before prescription begins to run." *Bosarge v. DePaul/Tulane Behav. Health Ctr.*, 2009-1345, p. 5 (La. App. 4 Cir. 5/19/10), 39 So.3d 790, 794 (citing *Claim of Aron*, 1996–2665, p. 3 (La. App. 4 Cir. 5/21/97), 695 So.2d 553, 556).

Furthermore, as it relates specifically to Plaintiffs' claims for wrongful death, arguably *contra non valentem* cannot suspend the prescriptive period thereto because Plaintiffs knew of the date of Ms. Kirt's death. *See Med. Rev. Panel for Bush,* 2021-00954, p. 7 (La. 5/13/22), 339 So.3d 1118, 1123 (noting that the death of the patient following a suicide attempt "was certainly sufficient to excite attention to begin the running of prescription in the wrongful death claim filed by plaintiffs"); *see also In re Guidry*, 2017-0105, pp. 7-8 (La. App. 5 Cir. 8/30/17), 225 So.3d 1169, 1175 (the discovery rule under the doctrine of *contra non*

---

[24] The petition for damages also acknowledges that the surgery never occurred.

*valentem* could not be used to suspend the prescriptive period in wrongful death action that was premised on medical malpractice, where patient's family knew the date patient died and the family's original claim, which they timely filed, made no mention of any inability to discover the alleged malpractice).[25]

Plaintiffs had sufficient information to excite their attention and recognize that Ms. Kirt's condition may be related to her medical treatment where Ms. Kirt coded and experienced numerous complications after the implementation of anesthesia, continually deteriorated, and died. Additionally, Plaintiff named and made specific negligence allegations against Taquino and Parish Anesthesia in October and November of 2011. Plaintiffs' argument that the August 2012 deposition of Taquino was the "earliest" they could have discovered their cause of action against Taquino and Parish Anesthesia lacks merit.

**CONCLUSION**

For the above stated reasons, the trial court judgment granting the exception of prescription in favor of Taquino and Parish Anesthesia is affirmed.

**AFFIRMED**

---

[25] It is important to note, however, that some courts have applied a fact based reasonableness inquiry to determine whether *contra non valentem* should apply to the prescription period for wrongful death claims in medical malpractice actions. For example, the Third Circuit in *Brooks v. Meaux,* 2018-980, pp. 11-12 (La. App. 3 Cir. 6/12/19), 275 So.3d 41, 48–49, noted that while the damage was apparent at the time of the patient's death, the ultimate question was the reasonableness of the patient in discovering the malpractice. The *Brooks* Court stated: "Undoubtedly, the damage in this case was readily apparent at the time of Mrs. Brooks' death. In *Campo,* 828 So.2d at 511, however, the [S]upreme [C]ourt instructed that even upon an awareness of damages, prescription 'will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be treatment related.'" *See also In re Guidry*, 2017-0105, p. 10, 225 So.3d at 1181 (Liljeberg, J., dissenting) (stating that "[t]he same evidence, facts and circumstances apply to both the wrongful death and survival actions; "the survival and wrongful death actions are interrelated to the extent they both arise from the same negligence or fault, which is the medical malpractice;" "[i]t is contradictory to have two different factual findings as to when sufficient knowledge existed to commence the prescriptive period for each cause of action").